UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
GLYNICE SIMMONS, individually and as
Administratrix of the ESTATE OF DAINELL      14-CV-3884 (AMD) (ARL)
ERIK SIMMONS,

            Plaintiff,

    -against-

COUNTY OF SUFFOLK; GEORGE OLIVA;
KAREN GRENIA; SUSAN CATALDO; SAL
YOVINO; JAMES POLTORAK; KEVIN
WUESTENHOFF; JEFFREY PITKEWICS;
STEVEN TURNER; RICHARD CIACCIO,
JAMES SAMARTINO; DENISE FIERRO;
FRANK LEOTTA, and POLICE OFFICERS
"JOHN DOE" 1-10,

            Defendants.
----------------------------------------------------------------X

# PLAINTIFF'S [DRAFT] RULE 56.1 STATEMENT OF MATERIAL FACTS ABOUT WHICH THERE IS NO GENUINE ISSUE OF FACT FOR TRIAL

Brett H. Klein, Esq., PLLC     Cuti Hecker Wang LLP
305 Broadway, Suite 600     305 Broadway, Suite 607
New York, New York 10007     New York, New York 10007
(212) 335-0132     (212) 620-2600

*Attorneys for Plaintiff*

Pursuant to Local Rule 56.1 and Rule 4.B. of Judge Donnelly's Individual Practices, Plaintiff hereby submits this draft Statement of Material Facts About Which There Is No Genuine Issue of Fact for Trial with respect to the liability of Defendants County of Suffolk, George Oliva, Karen Grenia, Susan Cataldo, Sal Yovino, James Polotorak, Kevin Wuestenhoff, Jeffrey Pitkewics, Richard Ciaccio, James Samartino, Steven Turner, and Frank Leotta.

1. At all relevant times, the individual Defendants were employees of the County of Suffolk acting within the scope of their employment.

2. It is Defendant County of Suffolk's policy that its police officers must always use the least amount of force necessary under the circumstances, and that anything more than the minimum amount of force is considered excessive force. Bracht 42:8-17; 70:4-24.

3. Suffolk County police officers are trained that there are risks associated with prone positioning of persons in custody that range from difficulty breathing to sudden in-custody death. Bracht 45:25-48:10; 80:4-22.

4. Suffolk County police officers are trained that if a subject in custody is maintained in a prone position longer than necessary and, as a result, the subject dies of asphyxia, even though the officer did not intend to cause death, the officer still could be subject to civil liability. Bracht 87:11-88:19.

5. Suffolk County police officers are trained that a subject being taken into custody who is both a person with a mental impairment ("PMI") and obese meets two predisposing factors for sudden in custody death. Bracht 91:15-22.

6. Suffolk County police officers know that an intense physical struggle is a further compounding factor that, when added to obesity, PMI status, and prone positioning with pressure on the back to a person who is handcuffed and whose feet are tied, increases the potential

lethality of putting weight on such a person while they are in a prone position. Bracht 114:17-117:23

7. Suffolk County police officers use the term of art "controlled" to mean that "the person is no longer a threat to me, to other police officers or other people or themselves." Bracht 48:11-20.

8. Suffolk County police officers have been trained since at least 1993 that someone who is prone should be taken out of that position at the earliest possible opportunity because restraining someone such a manner can restrict their ability to breath and could result in sudden in-custody death. Bracht 50:14-54:15.

9. Suffolk County police officers are trained about the concept of "inertia dangers" – that is, in stressful situations involving multiple officers, there needs to be a heightened awareness of the subject's safety and ability to breathe. Bracht 64:6-65:7.

10. It is Defendant County of Suffolk's policy that, whenever practical and absent an immediate threat of harm to the PMI or others present, no attempt shall be made to take a PMI into custody without requesting a supervisor and emergency service section unit at the scene. Bracht 73:16-74:3.

11. It is Defendant County of Suffolk's policy that to the extent possible, the responding police officer shall maintain a safe distance from the PMI with a minimum distance of twenty feet recommended. Bracht 74:23-75:16.

12. Suffolk County police officers are trained generally about dealing with persons with disabilities, and in particular, with autistic persons.

13. Suffolk County police officers are trained that autistic persons may have tantrums or display distress or appear insensitive to pain, and are instructed that if such individuals need to be restrained, that they should be sat up after being handcuffed. Sitler I 110:14-113:21.

14. Suffolk County police officers are trained that autistic persons may not be able to express what they are feeling. Sitler I 110:14-113:21.

15. Suffolk County police officers know that taking out handcuffs in close proximity to an autistic person and notifying the autistic person that he/she will be taken to the psychiatric emergency room may be perceived as threatening to an otherwise calm autistic person. Sitler I 115:25-117:5.

16. Suffolk County police officers are trained that touching a person with autism may cause a protective reaction, and they are trained never to touch an autistic person on the shoulders or near the face, as autistic hypersensitivity includes being touched. Sitler I 117:6-19.

17. Suffolk County police officers are trained that an autistic person can become more agitated if the situation has escalated unreasonably by the police. Sitler I 129:3-8.

18. Suffolk County police officers are trained that an agitated autistic person may engage in self-biting, and that the police response should be to deescalate such a situation by, among other tactics, showing empathy, speaking with them, and trying to relate to them. Sitler II 163:13-164:17.

19. Suffolk County police officers are trained that autistic persons could be subjected to pain but not able to express it. Sitler II 172:23-173:7.

20. Each of the individually named Defendant officers were trained and understood that they may not use more than the minimum force necessary to control a subject. Cataldo 109:2-7; Oliva 249:13-18; Grenia 14:24-15:8; Yovino 25:8-12.

21. Each of the individually named Defendant officers were trained and understood that using more than the minimum force necessary to control a subject is excessive and unreasonable. Cataldo 109:8-110:6; Oliva 250:19-251:21; Grenia 15:9-16; Leotta 15:20-25.

22. Each of the individually named Defendant officers were trained and understood that when interacting with a PMI, it is important to deescalate the situation. Grenia 18:23-20:10.

23. Each of the individually named Defendant officers were trained and understood that when interacting with a PMI, it is important to contain the subject. Grenia 23:2-24:13.

24. Each of the individually named Defendant officers were trained and understood that when interacting with a PMI, it is important to maintain a distance from the subject of at least twenty feet. Grenia 31:23-32:4.

25. Each of the individually named Defendant officers were trained and understood that placing weight on a subject who is prone is prohibited because doing so creates a significant risk of asphyxia. Grenia 45:6-46:3, 47:16-21, 50:14-22, 51:2-12, 52:2-53:11, 54:4-12, 54:22-55:3, 64:17-22; Cataldo 229:21-231:5, 300:22-301:2; Leotta 13:7-14:4, 42:12-19; Yovino 100:8-103:6; Ciaccio 39:14-24; Turner 67:24:-69:18; Fandrey I 10:12-24.

26. Each of the individually named Defendant officers were trained and understood that placing weight on an obsese subject who is prone increases the risk of asphyxia. Grenia 65:12-20, 67:4-8.

27. When Cataldo, Grenia, and Oliva arrived at Maryhaven, they knew that Simmons was a PMI. Oliva 183:14-20; Grenia 15:23-17:13, 112:4-18.

28. None of the Defendant officers believed that Simmons had committed a crime. Grenia 18:10-16; Cataldo 221:16-21.

29. The officers' goal was only to take Simmons into custody for purposes of transporting him to Stony Brook Hospital's Comprehensive Psychiatric Emergency Program ("CPEP") for evaluation. Grenia 18:10-16.

30. Grenia was the first officer to arrive at Maryhaven. Grenia 90:19-21.

31. Grenia arrived at 8:25 p.m. Grenia 102:14-18.

32. When Grenia first entered Maryhaven, Simmons was in the living room with the house manager, Jermaine Hendrickson. Grenia 92:3-10.

33. Simmons was agitated. Grenia 93:18-94:4

34. Grenia directed Simmons to sit down in a chair, and Simmons complied. Grenia 95:4-8; Oliva 177:7-14, 191:24-192:3, 177:24-178:8.

35. Grenia then radioed to the dispatcher that the situation was "controlled" because Simmons was sitting and compliant. Grenia 95:9-12.

36. Grenia did not consider Simmons to be a threat to himself or others. Grenia 103:19-24.

37. Oliva arrived at 8:28 p.m. Grenia 102:19-22.

38. Cataldo arrived at 8:29 p.m. Grenia 102:19-22.

39. Cataldo, Oliva, and Grenia then began to discuss, in front of and within earshot of Simmons, whether to take Simmons to CPEP for evaluation. Oliva 195:9-20.

40. The officers' discussion about whether to take Simmons to CPEP for evaluation caused Simmons to become agitated. Oliva 195:21-196:3, 205:6-14.

41. Shortly after Oliva and Cataldo arrived, Simmons shouted "No police!" Cataldo 177:17-21, 182:3-7; Oliva 130:10-11, 180:17-25, 183:2-5, 192:11-13

42. Simmons ran from the room in which he was sitting into the kitchen, and he dove, "belly flop" style, onto the kitchen floor. Oliva 203:2-5, 11-13, 18-20, 206:7-11; Grenia 33:14-25, 34:2-5, 117:2-9; Cataldo 211:6-12, 213:11-13.

43. When Simmons dove onto the floor in the kitchen, he was not being violent or threatening anyone. Grenia 37:15-25, 40:13-19; Cataldo 211:13-22.

44. There was nobody else in the kitchen when Simmons ran into the kitchen and dove onto the floor. Grenia 34:8-16; Cataldo 211:13-17.

45. None of the officers chased after Simmons or approached him until he had already thrown himself belly first onto the kitchen floor. Grenia 41:4-12.

46. When Simmons dove onto the kitchen floor on his stomach, he put his hands under his chest. Cataldo 214:13-24.

47. Once Simmons had dove onto the floor on his stomach, he posed no threat to anyone. Grenia 123:10-13.

48. When Cataldo, Oliva, and Grenia chased Simmons into the kitchen, their goal still was not to take him into custody. Grenia 25:11-24.

49. All three of the officers grabbed Simmons while he was face down on the floor and tried to handcuff him. Oliva 208:3-209:4, 209:9-13, 210:2-15; Grenia 126:11-127:11; Cataldo 214:13-22.

50. While the officers were struggling to handcuff Simmons, they moved him several feet to a different location on the kitchen floor that was a less confined space. Oliva 211:8-212:7; Grenia 128:11-129:4.

51. Cataldo then used her taser to drive stun Simmons.. Cataldo 238:21-239:10, 239:23-240:13; Oliva 214:14-215:18; Grenia 132:11-133:4.

52. Cataldo then used her taser to drive stun Simmons a second time. Cataldo 243:8-244:2.

53. Cataldo then used her taser to dart tase Simmons. Oliva 217:13-24, 218:9-11.

54. Grenia then used Cataldo's taser to drive stun Simmons. Grenia 134:24-135:9; Cataldo 302:16-306:7.

55. Simmons was still on the floor, and the officers were able to front-handcuff him. Oliva 228:6-18; Grenia 140:11-141:2; Cataldo 250:4-251:6.

56. After Simmons was front-cuffed, he managed to stand up, and he ran towards the front door of the house.. Oliva 229:59, 15-17; Grenia 144:2-145:8; Cataldo 253:16-254:4.

57. As Simmons was running toward the front door of the house, Oliva tased Simmons in the back. Oliva 231:24-231:5, 233:5-13; Grenia 145:9-14; Cataldo 254:19-255:7.

58. As a result of being tased, Simmons fell to his knees several feet before the door. Oliva 65:24-66:3, 233:20-22; Grenia 148:4-21; Cataldo 259:9-14.

59. All three officers rushed to Simmons. Grenia 148:22-149:8.

60. Cataldo maced Simmons in the face. Oliva 71:19-72:5; Grenia 149:20-24; Cataldo 274:11-13, 278:18-22.

61. The mace incapacitated Simmons, and the officers were able to move the handcuffs from his front to his rear, such that he was rear-handcuffed. Oliva 65:2-8, 71:19-72:5, 240:25-241:12; Grenia 149:25-150:7; Cataldo 282:17-18, 283:6-16.

62. Simmons was lying down in a prone or partially position, rear-handcuffed. Oliva 72:24-73:2, 73:14-16.

63. All three officers were on top of Simmons while he was in a prone position, rear-handcuffed. Oliva 74:14-18.

64. Because Simmons was rear-cuffed, he no longer presented a significant threat. Oliva 85:8-14; Cataldo 288:25-289:4.

65. After the officers rear-cuffed Simmons, they placed him in a face-down position. Oliva 242:15-21.

66. Part of Simmons's chest was on the ground. Grenia 62:13-20.

67. Part of Simmons's stomach was on the ground. Grenia 62:21-23.

68. Simmons was at least partially prone. Oliva 66:10-17, 116:7-18, 118:11-119:23, 120:3-10, 121:14-16, 160:7-161:12; Grenia 62:24-63:22, 160-161:3, 162:16-163:5, 169:11-22; Yovino 67:22-68:10, 87:24-88:4, 122:24-123:5; Poltorak 19:11-13, 22:10-25, 62:2-7, 62:11-63:2, 88:3-22; Wustenhoff 61:7-23; Ciaccio 10:16-11:2, 40:10-13; Autopsy Report.

69. Simmons was closer to prone than supine. Grenia 162:12-15; Autopsy Report.

70. The fact that Simmons was partially prone created a risk of asphyxia. Oliva 123:10-24, 124:23-125:2; Grenia 64:5-9; Leotta 44:17-45:6.

71. Oliva was near Simmons' head, Grenia was near Simmons's feet, and Cataldo was in the middle near Simmons's torso. Grenia 163:18-164:4.

72. Oliva was using force to hold Simmons' head and arm down on the ground. Oliva 75:25-76:8, 76:20-77:20, 106:4-12.

73. Oliva used enough force holding Simmons' head and arm down on the ground that he became physically exhausted. Oliva 77:2-20, 77:25-78:17.

74. Grenia was using force trying to hold Simmons's legs together, including by using her body weight to put downward pressure on Simmons' legs. Grenia 164:5-11; Oliva 86:3-5.

75. Cataldo was lying across the midsection of Simmons' body, using her body weight to hold his torso down. Oliva 74:19-75:6, 79:4-20, 84:17-85:3, 120:11-16, 121:10-13; Grenia 167:20-168:16; Cataldo 299:4-8.

76. Cataldo, Oliva, and Grenia continued to use their body weight to hold Simmons down even though he was rear-handcuffed. Grenia 188:13-25.

77. The officers determined that they needed leg shackles to control Simmons' legs. Oliva 89:20-24.

78. At approximately 8:38 p.m., the dispatcher called a 10-1, meaning all available units should respond to the scene. Ciaccio 76:22-77:5; Ciaccio Ex. 2.

79. Samartino arrived at the scene at approximately 8:39 p.m. Leotta 127:7-13; Ciaccio 80:17-24; Ciaccio Ex. 2.

80. At approximately, 8:40 p.m., Oliva radioed dispatch requesting that someone bring leg shackles to the scene. Leotta 128:4-11; Ciaccio 82:24-83:11; Ciaccio Ex. 2.

81. The dispatcher responded to Oliva's request by acknowledging it and confirming that the situation was controlled. Ciaccio 83:12-84:3; Ciaccio Ex. 2.

82. Seconds later, Ciaccio radioed that he had plastic zip ties and was on his way. Ciaccio 84:4-14; Ciaccio Ex. 2.

83. Seconds later, dispatch radioed units responding to the scene to slow down because the situation was controlled. Ciaccio 85:16-86:6; Ciaccio Ex. 2.

84. Yovino arrived at the scene at approximately 8:41 p.m. Yovino 98:15-99:3; Ciaccio Ex. 2.

85. Cataldo, Oliva, and Grenia were still using their body weight to hold Simmons down when Yovino and Smartino arrived. Grenia 179:23-17.

86. Leotta arrived at the scene at approximately 8:42 p.m. Leotta 49:10-19; Ciaccio Ex. 2.

87. Leotta, who held the supervisory rank of sergeant, was the senior officer in charge of the scene. Leotta 66:9-11, 81:6-19; Ciaccio 23:2-9; Pitkewicz 25:8-11.

88. Less than a minute after he arrived, Leotta radioed that the situation was "controlled" because Simmons was lying on the ground and rear-handcuffed. Leotta 53:23-54:12, 86:21-25, 88:12-16, 128:12-129:5; Ciaccio 88:4-10.

89. Dispatch responded by acknowledging that the situation was controlled. Ciaccio 88:11-19.

90. Leotta decided that even though Simmons was not a criminal suspect, he should be taking into custody and transported to CPEP for mental observation. Leotta 54:13-55:7.

91. Leotta decided that the safest way to do that would be to strap Simmons to an ambulance gurney. Leotta 56:16-20.

92. Leotta decided that Simmons' legs should be tied together before he was strapped to a gurney for transport. Leotta 57:3-9, 58:5-9.

93. At approximately 8:43 p.m., Leotta radioed dispatch that and ambulance should be sent to the scene so that Simmons could be strapped to a gurney and transported to CPEP. Leotta 129:6-14; Ciaccio 88:20-89:90:7; Ciaccio Ex. 2.

94. The situation remained controlled. Leotta 130:2-5.

95. Wustenhoff arrived at the scene at approximately 8:45 p.m. Wustenhoff 18:25-19:5; Ciaccio Ex. 2.

96. At approximately 8:45 p.m., Leotta radioed dispatch asking who was coming to the scene with leg shackles. Leotta 130:6-13; Ciaccio 90:15-91:2; Ciaccio Ex. 2.

97. Approximately three seconds later, the dispatcher responded that Ciaccio was bringing leg shackles to the scene. Leotta 132:7-15; Ciaccio 91:3-10; Ciaccio Ex. 2.

98. Poltorak arrived at the scene at approximately 8:45 p.m. Poltorak 55:17-25; Ciaccio Ex. 2.

99. Turner arrived at the scene at approximately 8:45 p.m. Turner 10:13-17.

100. Fierro arrived at the scene at approximately 8:46 p.m. Fierro 7:22-8:7; Ciaccio Ex. 2.

101. Pitkewicz arrived at the scene at approximately 8:46 p.m. Pitkewicz 12:23-13:3; Ciaccio Ex. 2.

102. Ciaccio arrived at the scene at approximately 8:47 p.m. Ciaccio 69:3-7, 70:13-15; Ciaccio Ex. 2.

103. Pitkewicz and Ciaccio entered the home at approximately the same time. Pitkewicz 23:11-16.

104. At approximately 8:49 p.m., Leotta radioed to dispatch that the situation remained controlled and that the officers just needed to get Simmons transported in an ambulance. Leotta 132:16-133:12; Ciaccio 93:8-17; Ciaccio Ex. 2.

105. Cataldo continued to hold Simmons's midsection to the ground so that he could not get up. Turner 27:10-21, 41:24-42:2.

106. Leotta instructed the officers to make sure Simmons had a clear airway. Oliva 114:14-20; Grenia 166:17-21, 190:9-20, 193:3-17; Cataldo 309:10-25; Leotta 29:2-13; Yovino 181:3-8; Turner 67:5-8.

107. Leotta gave this instruction to the officers repeatedly. Oliva 114:18-20, 126:18-127:6; Leotta 29:2-13; Yovino 121:16-122:9.

108. Leotta appeared to be concerned. Oliva 114:24-115:15.

109. Leotta never instructed the officers to stop putting weight on Simmons' back. Oliva 133:14-25; Leotta 82:13-83:2.

110. As Cataldo, Oliva, and Grenia continued to stuggle with Simmons, Yovino grabbed Simmons' wrists. Yovino 83:3-84:18.

111. Yovino continued to hold Simmons' hands for several minutes. Yovino 88:8-14.

112. During that period, when Yovino was not holding Simmons' hands, he was holding his upper legs and buttocks area. Yovino 89:6-14.

113. Poltorak, Wustenhoff, Pitkewicz, and Turner attempted to control Simmons' legs. Poltorak 27:10-20, 66:15-69:6, 66:22-67:5; Wustenhoff 33:10-34:3, 34:10-35:22, 36:13-19; Pitkewicz 24:12-21; Turner 42:18-23, 44:5-45:2.

114. Poltorak, Wustenhoff, Pitkewicz, and Turner were able to control Simmons' legs and hold them until the zip ties arrived. Turner 45:3-46:8, 54:6-13.

115. Poltorak, Pitkewicz, Turner, and Wuestenhoff applied the zip ties to Simmons' legs. Poltorak 69:7-15; 49:15-52:7; Samartino 25:2-5.

116. Once Simmons was both rear-cuffed and leg-tied, he no longer presented any threat against any officer, and there no longer was a justification for using force on him. Turner 86:12-21.

117. O'Hara and Milau arrived at the scene at approximately 8:44. O'Hara 36:12-23.

118. Oliva continued to use force to hold Simmons' head and arm down on the ground continuously until he stopped moving. Oliva 82:13-22, 89:16-19, 91:15-92:2; Yovino 89:18-23; O'Hara 12:17-22:9.

119. Cataldo continued to lie across the midsection of Simmons' body, using her body weight to hold his torso down, continuously until he stopped moving. Oliva 82:20-84:16, 89:16-19, 92:3-5; Yovino 89:23-91:4.

120. Simmons continued to be at least partially in a prone position continuously until he stopped moving. Oliva 82:19-23; O'Hara 18:22-20:3; Milau 20:8-12.

121. Cataldo and Oliva continued to put their weight on Simmons and to hold him down even after Simmons' legs were tied together with zip ties. Oliva 101:2-6, 101:25-102:24; Poltorak 72:22-24; O'Hara 20:21-16, 21:17-22:2.

122. Simmons was not able to move his legs at all because they were tied and one or more officers were holding them down. Milau 20:16-21:17.

123. Simmons was thrashing his torso around as the officers continued to put weight on him, but he did not appear to be trying to get up. O'Hara 20:14-20.

124. Even after Simmons was rear-cuffed and leg-tied, the officers continued to use a significant amount of force to hold him down. Milau 12:2-16:4.

125. The officer closest to Simmons's head was pushing him down. Milau 21:18-22:13.

126. Cataldo was pushing Simmons's torso down. Milau 22:14-23:2.

127. The officers continued to hold Simmons down, while he was rear-cuffed and leg-shackled, in at least a partially prone position until he stopped moving. Oliva 102:15-24; Cataldo 321:6-10, 385:25-386:5.

128. As the officers were trying to apply the leg restraints to Simmons, Wustenhoff pulled Simmons's left foot 12 inches up in the air, backwards, as Simmons lay on his front. Wustenhoff 45:12-46:20.

129. Wustenhoff believed it was necessary to lift Simmons' foot in the air, backwards, in order to apply the leg restraints. Wustenhoff 63:13-19.

130. Wustenhoff raised Simmon's left foot in the air for approximately 30 seconds to a minute before the leg restraints were applied to both legs. Wustenhoff 50:9-22.

131. Due to Simmons' autism, he spoke very little, and was unable to communicate verbally that he could not breathe. Fandrey I 190:8-11; Fandrey Ex. 2.

132. Very shortly after the zip ties were applied to Simmons's legs, he suddenly went limp and stopped breathing. Yovino 104:6-13, 108:16-22; Poltorak 71:6-25; Wustenhoff 52:16-53:5, 61:24-22., 63:25-64:4, 64:8-12; Turner 56:20-57:11.

133. The EMTs had not yet arrived when Simmons went into cardiac arrest. Ciaccio 32:6-10.

134. The officers uncuffed Simmons, rolled him onto his back, and Yovino began CPR. Yovino 113:20-114:6; Wustenhoff 55:2-12.

135. The officers also tried to revive Simmons by using an automated defibrillator. Yovino 115:13-116:19; Poltorak 78:14-25; Wustenhoff 55:2-12.

136. EMS arrived at the scene at 8:51 p.m. Oliva Ex. 1.

137. EMS arrived at the scene approximately one minute after Simmons went into cardiac arrest. Leotta 94:7-12; Poltorak 87:11-88:2; Wustenhoff 19:10-21; Oliva Ex. 1.

138. No officer radioed dispatch to inform dispatch that Simmons had gone into cardiac arrest. Leotta 89:3-6; Fierro 21:23-22:7; Ciaccio 98:15-100:10, 100:23-101:7.

139. Normally, when a subject goes into cardiac arrest, an officer radios that fact to dispatch. Ciaccio 28:2-29:16.

140. All of the officers who were involved in the incident were placed in the same room together at the 7th precinct – the crime control room – where they discussed the incident with one another. Cataldo 39:12-40:10, 357:24-358:4, 359:3-8; Oliva 150:9-151:15, 151:23-152:4, 152:17-22; Grenia 210:24-212:8; Yovino 8:23-9:5, 20:4-20; Poltorak 30:24-31:11; Ciaccio 48:2-15; Turner 77:9-79:12.

141. One of the things the officers discussed was whether Simmons might have asphyxiated. Ciaccio 48:11-23, 49:10-12, 51:10-17.

142. It was improper for the officers to discuss the incident before they completed their written reports about the incident. Leotta 114:6-115:12.

143. Simmons's death was a homicide. Autopsy Report; Baden Decl.; Fandrey I 7:13-18.

144. The cause of Simmons' death was a violent struggle that included prone positioning and chest compression. Autopsy Report.

145. The compression of Simmons chest caused him to be deprived of oxygen and to asphyxiate. DeJoseph 7:1-4, 83:2-7, 103:7-17; Baden Decl.

146. The fatal chest compression occurred toward the end of the timeline, shortly before Simmons went limp. DeJoseph 109:20-25; Baden Decl.

147. The compression of Simmons chest and resulting oxygen deprivation was a substantial factor in causing his death. DeJoseph 7:12-8:17, 12:7-9; Baden Decl.; Fandrey I 195:9-21.

148. Mr. Simmons's body had contusions that were consistent with chest compression. Autopsy Report at 2; DeJoseph 13:12-21.

149. Simmons's body had petechial hemorrhages. O'Hara 48:19-22; Fandrey II 15:18-10.

150. The petechiae on Simmons's shoulder and eyelids were indicative of chest compression. DeJoseph 13:22-25; Fandrey II 16:2-10.

151. The medical examiner found abundant evidence that Simmons' chest was compressed. DeJoseph 69:10-13.

152. The medical examiner informed Fandrey that she had found abundant evidence of compression asphyxia. Fandrey I 99:11-100:2, 116:3-9.

153. The Office of the Suffolk County Attorney represents Dr. DeJoseph in this case.

154. The fact that Simmons was obese and in a partially prone position also was a substantial factor in causing his death because prone positioning combined with obesity makes it more difficult for the subject's chest to expand during respiration. DeJoseph 8:24-10:3, 14:7-14, 15:7-8, 58-60:11, 98:23-99:1; Baden Decl.

155. The fact that Simmons was rear-cuffed while he was in a partially prone position exacerbated the risk that he would asphyxiate. DeJoseph 61:12-23.

156. The fact that Simmons was engaged in violent struggle prior to being placed in prone position exacerbated the risk that he would asphyxiate. DeJoseph 42:23-43:8.

157. The fact that Simmons was obese exacerbated the risk that he would asphyxiate. Wetli Dep; Baden Aff.

158. None of the officers was justified in using deadly force. Leotta 52:25-53:9, 64:25-65:9.

159. Suffolk County, through its medical examiner, determined that Simmons's death was a homicide caused in substantial part by chest compression during prone positioning. Autopsy Report; DeJoseph Dep.

160. Suffolk County presented the facts and circumstances of Simmons's death to a Suffolk County grand jury as a homicide.

Dated: New York, New York
       June 2, 2017

                                              By:_____**[DRAFT]**_____
                                                 Eric Hecker
                                                 Cuti Hecker Wang, LLP
                                                 305 Broadway, Suite 607
                                                 New York, New York 10007
                                                 (212) 620-2600

                                                 Brett H. Klein
                                                 Brett H. Klein PLLC
                                                 305 Broadway, Suite 600
                                                 New York, New York 10007
                                                 (212) 335-0132

                                                 *Attorneys for Plaintiff*