UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
GLYNICE SIMMONS, individually and as
Administratrix of the ESTATE OF DAINELL
SIMMONS,

                        Plaintiff,

       -against-

COUNTY OF SUFFOLK; GEORGE OLIVA; KAREN
GRENIA; SUSAN CATALDO; SAL YOVINO; JAMES
POLTORAK; KEVIN WUESTENHOFF; JEFFREY
PITKEWICS; STEVEN TURNER; RICHARD CIACCIO;
JAMES SAMARTINO; DENISE FIERRO;
FRANK LEOTTA, and POLICE OFFICERS
"JOHN DOE" 1-10,

                        Defendants.
----------------------------------------------------------------X

**DEFENDANTS'
COUNTERSTATEMENT
PURSUANT TO LOCAL RULE
56.1(b)**

14-cv-3884(AMD)(ARL)

Pursuant to Local Rule 56.1 and Rule 4.B. of Judge Donnelly's Individual Practices,

defendants hereby submit the following as and for their Counterstatement Pursuant to

Local Rule 56.1(b):

1.      At all relevant times, the individual Defendants were employees of the County of

Suffolk acting within the scope of their employment.

      Admitted.

2.      It is Defendant County of Suffolk's policy that its police officers must always use

the least amount of force necessary under the circumstances, and that anything more than

the minimum amount of force is considered excessive force. Bracht 42:8-17; 70:4-24.

      Admit only that it is defendant County of Suffolk's policy that its police officers must

always use the least amount of force necessary under the circumstances, and that anything

more than the minimum amount of force necessary under the circumstances is considered excessive force. Bracht 8:4-12, 33:4-7, 40:12, 42:8-17, 70:4-24; otherwise denied.

3.      Suffolk County police officers are trained that there are risks associated with prone positioning of persons in custody that range from difficulty breathing to sudden in-custody death. Bracht 45:25-48:10; 80:4-22.

Admit only that prior to becoming probationary police officers, Suffolk County Police Recruits ("recruits") in the academy in February 2017 were trained that there may be risks associated with prone positioning of persons in custody that range from difficulty breathing to sudden in-custody death. Bracht 8:4-12, 33:4-7, 45:25-48:10, 80:4-22; otherwise denied.

4.      Suffolk County police officers are trained that if a subject in custody is maintained in a prone position longer than necessary and, as a result, the subject dies of asphyxia, even though the officer did not intend to cause death, the officer still could be subject to civil liability. Bracht 87:11-88:19.

Admit only that prior to becoming probationary police officers, recruits in the academy in February 2017 were trained that if a subject in custody is maintained in a prone position longer than necessary and, as a result, the subject dies of asphyxia, even though the officer did not intend to cause death, the officer still could be subject to civil liability. Bracht 8:4-12, 33:4-7, 87:11-88:19; otherwise denied.

5.      Suffolk County police officers are trained that a subject being taken into custody who is both a person with a mental impairment ("PMI") and obese meets two predisposing factors for sudden in custody death. Bracht 91:15-22.

Admit only that prior to becoming probationary police officers, recruits that were in the academy in February 2017 were trained that a subject being taken into custody who is both a person with a mental impairment ("PMI") and obese meets two predisposing factors for sudden in custody death. Bracht 8:4-12, 33:4-7, 91:15-22; otherwise denied.

6.      Suffolk County police officers know that an intense physical struggle is a further compounding factor that, when added to obesity, PMI status, and prone positioning with pressure on the back to a person who is handcuffed and whose feet are tied, increases the potential lethality of putting weight on such a person while they are in a prone position. Bracht 114:17-117:23

Admit only that prior to becoming probationary police officers, recruits that were in the academy in February 2017 were trained that an intense physical struggle is a compounding factor that, when added to obesity, PMI status, and prone positioning with pressure on the back to a person who is handcuffed and whose feet are tied, may increase the potential lethality of putting weight on such a person while they are in a prone position. Bracht 8:4-12, 33:4-7, 114:17-117:23; otherwise denied.

7.      Suffolk County police officers use the term of art "controlled" to mean that "the person is no longer a threat to me, to other police officers or other people or themselves." Bracht 48:11-20.

Admit only that as used in the police academy during Bracht's tenure there, the term "controlled" means that "the person is no longer a threat to me, to other police officers or other people or themselves." Bracht 8:4-12, 33:4-7, 48:11-20; otherwise denied.

8.      Suffolk County police officers have been trained since at least 1993 that someone who is prone should be taken out of that position at the earliest possible opportunity because restraining someone such a manner can restrict their ability to breathe and could result in sudden in-custody death. Bracht 50:14-54:15.

Admit only that Suffolk County police recruits have been trained since at least 2005 that someone who is prone should be taken out of that position at the earliest possible opportunity because restraining someone in such a manner could affect their ability to breath and could possibly create a risk of sudden in-custody death; and that Bracht

believes that recruits were similarly trained since 1993. Bracht 8:4-12, 33:4-7, 50:14-54:15; otherwise denied.

9.      Suffolk County police officers are trained about the concept of "inertia dangers" – that is, in stressful situations involving multiple officers, there needs to be a heightened awareness of the subject's safety and ability to breathe. Bracht 64:6-65:7.

Admit only that Suffolk County police recruits have been trained since at least 2005 about the concept of "inertia dangers"; and that Bracht believes that recruits were similarly trained since 1993. Bracht 8:4-12, 33:4-7, 64:6-65:7; otherwise denied.

10.     It is Defendant County of Suffolk's policy that, whenever practical and absent an immediate threat of harm to the PMI or others present, no attempt shall be made to take a PMI into custody without requesting a supervisor and emergency service section unit at the scene. Bracht 73:16-74:3.

Admit only that in February 2017, it was the policy of the County that, whenever practical and absent an immediate threat of harm to the PMI or others present, no attempt shall be made to take a PMI into custody without requesting a supervisor and emergency service section unit at the scene, but that Bracht does not know when that became the County's policy.  Bracht 73:16-74:3; otherwise denied.

11.     It is Defendant County of Suffolk's policy that to the extent possible, the responding police officer shall maintain a safe distance from the PMI with a minimum distance f twenty feet recommended. Bracht 74:23-75:16.

Admit only that it has been the County's policy since 2011, that to the extent possible, the responding police officer shall maintain a safe distance from the PMI with a minimum distance of twenty feet recommended; but that Bracht does not know if that was County policy since 2005. Bracht 74:23-75:16; otherwise denied.

12. Suffolk County police officers are trained generally about dealing with persons with disabilities, and in particular, with autistic persons.

Admitted.

13. Suffolk County police officers are trained that autistic persons may have tantrums or display distress or appear insensitive to pain, and are instructed that if such individuals need to be restrained, that they should be sat up after being handcuffed. Sitler I 110:14-113:21.

Admit only that since Officer Raymond Sitler ("Sitler") began teaching the mental health curriculum at the academy in or about 2005, he has trained recruits that autistic persons may have tantrums or display distress or appear insensitive to pain, and are instructed that if such individuals need to be restrained, that they should be sat up after being handcuffed. Sitler I 28:17-23, 110:14-113:21; otherwise denied.

14. Suffolk County police officers are trained that autistic persons may not be able to express what they are feeling. Sitler I 110:14-113:21.

Admit only that since Sitler began teaching at the academy in or about 2005, he has trained recruits that autistic persons may not be able to express what they are feeling. Sitler I 28:17-23, 110:14-113:21; otherwise denied.

15. Suffolk County police officers know that taking out handcuffs in close proximity to an autistic person and notifying the autistic person that he/she will be taken to the psychiatric emergency room may be perceived as threatening to an otherwise calm autistic person. Sitler I 115:25-117:5.

Admit only that since Sitler began teaching at the academy in or about 2005, recruits may have been informed that taking out handcuffs in close proximity to an autistic person and notifying the autistic person that he/she will be taken to the psychiatric emergency

5

room is an example of something that may be perceived as threatening by the autistic person. Sitler I 28:17-23, 115:25-117:5; otherwise denied.

16.     Suffolk County police officers are trained that touching a person with autism may cause a protective reaction, and they are trained never to touch an autistic person on the shoulders or near the face, as autistic hypersensitivity includes being touched. Sitler I 117:6-19.

        Admit only that since Sitler began teaching at the academy in or about 2005, recruits have been trained that touching a person with autism may cause a protective reaction, and they are trained not to touch an autistic person on the shoulders or near the face, as autistic hypersensitivity includes being touched. Sitler I 28:17-23, 117:6-19; otherwise denied.

17.     Suffolk County police officers are trained that an autistic person can become more agitated if the situation has escalated unreasonably by the police. Sitler I 129:3-8.

        Admit only that since Sitler began teaching at the academy in or about 2005, recruits have been trained that an autistic person can become more agitated if the situation has escalated unreasonably by the police. Sitler I 28:17-23, 129:3-8; otherwise denied.

18.     Suffolk County police officers are trained that an agitated autistic person may engage in self-biting, and that the police response should be to deescalate such a situation by, among other tactics, showing empathy, speaking with them, and trying to relate to them. Sitler II 163:13-164:17.

        Admit only that since Sitler began teaching at the academy in or about 2005, recruits have been trained that an agitated autistic person may engage in self-biting, and that the police response should be to deescalate such a situation by, among other tactics, showing empathy, speaking with them, and trying to relate to them. Sitler I 28:17-23; Sitler II 141:24-142:9, 163:13-164:17; otherwise denied.

19.     Suffolk County police officers are trained that autistic persons could be subjected to pain but not able to express it. Sitler II 172:23-173:7.

Admit only that since Sitler began teaching at the academy in or about 2005, recruits have been trained that autistic persons could be subjected to pain but not able to express it. Sitler I 28:17-23; Sitler II 172:23-173:7; otherwise denied.

20.     Each of the individually named Defendant officers were trained and understood that they may not use more than the minimum force necessary to control a subject. Cataldo 109:2-7; Oliva 249:13-18; Grenia 14:24-15:8; Yovino 25:8-12.

Admit only that the individual defendants were trained and understood that they may not use more than the minimum force necessary under the circumstances to control a subject.  Cataldo 109:2-11; Oliva 249:13-251:17; Grenia 14:24-15:16; Yovino 25:8-26:6; otherwise denied.

21.     Each of the individually named Defendant officers were trained and understood that using more than the minimum force necessary to control a subject is excessive and unreasonable. Cataldo 109:8-110:6; Oliva 250:19-251:21; Grenia 15:9-16; Leotta 15:20-25.

Admit only that the individual defendants were trained and understood that they may not use more than the minimum force necessary under the circumstances to control a subject.  Cataldo 109:2-11; Oliva 249:13-251:17; Grenia 14:24-15:16; Yovino 25:8-26:6; otherwise denied.

22.     Each of the individually named Defendant officers were trained and understood that when interacting with a PMI, it is important to deescalate the situation. Grenia 18:23-20:10.

Admit only that when defendant Grenia ("Grenia") attended the academy in 2003-2004, she learned about the importance of deescalating situations. 6:24-7:24, 18:23-20:10; otherwise denied.

23.     Each of the individually named Defendant officers were trained and understood that when interacting with a PMI, it is important to contain the subject. Grenia 23:2-24:13.

        Admit only that defendant Grenia testified at her deposition that when she attended the academy in 2003-2004, she learned that when interacting with a PMI, it is important to contain the subject. Grenia 6:24-7:24, 23:2-24:13; otherwise denied.

24.     Each of the individually named Defendant officers were trained and understood that when interacting with a PMI, it is important to maintain a distance from the subject of at least twenty feet. Grenia 31:23-32:4.

        Admit only that on the date of this incident, based on her training, Grenia was aware that when interacting with a PMI, to the extent possible, she should maintain a distance from the subject of at least twenty feet. Grenia 31:23-32:4; otherwise denied.

25.     Each of the individually named Defendant officers were trained and understood that placing weight on a subject who is prone is prohibited because doing so creates a significant risk of asphyxia. Grenia 45:6-46:3, 47:16-21, 50:14-22, 51:2-12, 52:2-53:11, 54:4-12, 54:2255:3, 64:17-22; Cataldo 229:21-231:5, 300:22-301:2; Leotta 13:7-14:4, 42:12-19; Yovino 100:8103:6; Ciaccio 39:14-24; Turner 67:24:-69:18; Fandrey I 10:12-24.

        Admit only that the individual defendants were trained and understood that placing weight on a subject who is prone supposedly presents a risk that it will render the subject unable to breathe.  Grenia 45:6-46:3, 47:16-21, 50:14-22, 51:2-12, 52:2-53:11, 54:4-12, 54:22-55:3, 64:17-22; Cataldo 229:21-231:5, 300:22-301:2; Leotta 13:7-14:4, 42:12-19; Yovino 100:8-103:6; Ciaccio 39:14-24; Turner 67:24:-69:18; Fandrey I 10:12-24; otherwise denied.

26.     Each of the individually named Defendant officers were trained and understood that placing weight on an obese subject who is prone increases the risk of asphyxia. Grenia 65:12-20, 67:4-8.

Admit only that the individual defendants were trained and understood that placing weight on a subject who is obese prone presents a risk that it will render the subject unable to breathe. Grenia 45:6-46:3, 47:16-21, 50:14-22, 51:2-12, 52:2-53:11, 54:4-12, 54:2255:3, 64:17-22; Cataldo 229:21-231:5, 300:22-301:2; Leotta 13:7-14:4, 42:12-19; Yovino 100:8103:6; Ciaccio 39:14-24; Turner 67:24:-69:18; Fandrey I 10:12-24; otherwise denied.

27. When defendant Cataldo ("Cataldo")Cataldo, Grenia, and defendant Oliva ("Oliva") arrived at Maryhaven, they knew that Simmons was a PMI. Oliva 183:14-20; Grenia 15:23-17:13, 112:4-18. 28.

Admitted.

28. None of the Defendant officers believed that Simmons had committed a crime. Grenia 18:10-16; Cataldo 221:16-21.

Admitted.

29. The officers' goal was only to take Simmons into custody for purposes of transporting him to Stony Brook Hospital's Comprehensive Psychiatric Emergency Program ("CPEP") for evaluation. Grenia 18:10-16. 30.

Admit only that the officers were told by the Maryhaven house manager, Jermaine Hendrickson that they had to take Simmons to CPEP. Cataldo 171:25-173:7; Grenia 107:10-107:22; Fandrey Supplemental Report; otherwise denied.

30. Grenia was the first officer to arrive at Maryhaven. Grenia 90:19-21.

Admitted.

31. Grenia arrived at 8:25 p.m. Grenia 102:14-18.

Admitted.

32.     When Grenia first entered Maryhaven, Simmons was in the living room with the house manager, Jermaine Hendrickson. Grenia 92:3-10.

        Admitted.

33.     Simmons was agitated. Grenia 93:18-94:4

        Admitted.  Furthermore, Simmons was letting out primal screams and biting his arm.  Grenia 93:18-94:18

34.     Grenia directed Simmons to sit down in a chair, and Simmons complied. Grenia 95:4-8; Oliva 177:7-14, 191:24-192:3, 177:24-178:8.

        Admitted.

35.     Grenia then radioed to the dispatcher that the situation was "controlled" because Simmons was sitting and compliant. Grenia 95:9-12.

        Admitted.

36.     Grenia did not consider Simmons to be a threat to himself or others.  Grenia 103:19-24.

        Admit only that other than the possibility of biting himself, Grenia did not consider Simmons to be a threat to himself or others. Grenia 103:19-24; otherwise denied.

37.     Oliva arrived at 8:28 p.m. Grenia 102:19-22.

        Admitted.

38.     Cataldo arrived at 8:29 p.m. Grenia 102:19-22.

        Admitted.

39.    Cataldo, Oliva, and Grenia then began to discuss, in front of and within earshot of Simmons, whether to take Simmons to CPEP for evaluation. Oliva 195:9-20.

Admit only that Cataldo, Oliva, Grenia and Hendrickson then discussed in front of and within earshot of Simmons, whether to take Simmons to CPEP for evaluation. Oliva 195:9-20; Cataldo 171:25-173:7; Grenia 107:10-107:22; Fandrey Supplemental Report;

40.    The officers' discussion about whether to take Simmons to CPEP for evaluation caused Simmons to become agitated. Oliva 195:21-196:3, 205:6-14.

Admit only that Simmons became agitated after the officers and Hendrickson began discussing whether to take Simmons to CPEP for evaluation. The officers do not know what was in Simmons mind that caused his agitation.  Oliva 195:21-196:3, 205:6-14; otherwise denied.

41.    Shortly after Oliva and Cataldo arrived, Simmons shouted "No police!" Cataldo 177:17-21, 182:3-7; Oliva 130:10-11, 180:17-25, 183:2-5, 192:11-13

Admitted.

42.    Simmons ran from the room in which he was sitting into the kitchen, and he dove, "belly flop" style, onto the kitchen floor. Oliva 203:2-5, 11-13, 18-20, 206:7-11; Grenia 33:1425, 34:2-5, 117:2-9; Cataldo 211:6-12, 213:11-13.

Admitted.

43.    When Simmons dove onto the floor in the kitchen, he was not being violent or threatening anyone. Grenia 37:15-25, 40:13-19; Cataldo 211:13-22.

Admit only that when Simmons dove onto the floor in the kitchen, he was momentarily not being violent or threatening anyone. Grenia 37:15-25, 40:13-19; Cataldo 211:13-22.

44. There was nobody else in the kitchen when Simmons ran into the kitchen and dove onto the floor. Grenia 34:8-16; Cataldo 211:13-17.

Admitted.

45. None of the officers chased after Simmons or approached him until he had already thrown himself belly first onto the kitchen floor. Grenia 41:4-12.

Admitted.

46. When Simmons dove onto the kitchen floor on his stomach, he put his hands under his chest. Cataldo 214:13-24.

Admitted.

47. Once Simmons had dove onto the floor on his stomach, he posed no threat to anyone. Grenia 123:10-13.

Admit only that once Simmons had dove onto the floor on his stomach, he posed no threat to the officers, but may have posed a threat to his own safety, and the officers were concerned about the threat he posed to other persons in the house. Grenia 123:10-19; Cataldo 212:4-12 otherwise denied.

48. When Cataldo, Oliva, and Grenia chased Simmons into the kitchen, their goal still was not to take him into custody. Grenia 25:11-24.

Admit only that when Cataldo, Oliva, and Grenia followed chased Simmons into the kitchen, their goal still was not to arrest him for a criminal act, but to transport him to CPEP, as requested by the house manager. Grenia 25:11-36:21; otherwise denied.

49. All three of the officers grabbed Simmons while he was face down on the floor and tried to handcuff him. Oliva 208:3-209:4, 209:9-13, 210:2-15; Grenia 126:11-127:11; Cataldo 214:13-22.

Admit only that at some point after he fell to the kitchen floor on his belly, the three of the officers grabbed Simmons and tried to handcuff him. Oliva 208:3-209:4, 209:9-13, 210:2-15; Grenia 126:11-127:11; Cataldo 214:13-22; otherwise denied.

The cited testimony provides no evidence that Simmons was face down on the floor when the officers tried to handcuff him.

50.     While the officers were struggling to handcuff Simmons, they moved him several feet to a different location on the kitchen floor that was a less confined space. Oliva 211:8212:7; Grenia 128:11-129:4.

Admit only that when the officers were struggling to handcuff Simmons, they moved him several feet to a different location on the kitchen floor that was a less confined space and away from the refrigerator that had begun to fall due to Simmons' efforts to get up. Oliva 211:8-212:7; Grenia 128:11-129:4; Cataldo 216:10 -218:20; otherwise denied.

51.     Cataldo then used her taser to drive stun Simmons.. Cataldo 238:21-239:10, 239:23-240:13; Oliva 214:14-215:18; Grenia 132:11-133:4.

Admit only that after they moved Simmons to a less confined space, he continued to struggle with the officers.  He threw the officers off of him.  He was attempting to bite the officers. He was pushing up with his shoulders, knees and legs, trying to get up.  He was kicking the officers.  Cataldo 228:22-239:10, 239:23-240:13; Oliva 209:9- 215:18; Grenia 132:11-133:4; otherwise denied.

Before Cataldo used her taser, she gave Simmons a verbal warning that she would taser him if he continued to fight. Cataldo was not able to touch Simmons correctly with the taser because he was fighting violently and the taser appeared not to affect Simmons. Simmons continued to fight after Cataldo tasered him by flailing his legs and arms.  Cataldo 238:14-240:7; Oliva 212:29-213:18; 215-19-216:13.

52.     Cataldo then used her taser to drive stun Simmons a second time. Cataldo 243:8244:2.

Admitted.

53.    Cataldo then used her taser to dart tase Simmons. Oliva 217:13-24, 218:9-11.

Admit only that after drive stunning Simmons, Cataldo attempted to taser him in dart mode.  However, one dart made only glancing contact with his skin and as a result, the circuit needed for effective operation was not made.  Krivosta 101:16-104:16, 135:13-137:5, 142:6-14:14. 155:15-20; otherwise denied.

54.    Grenia then used Cataldo's taser to drive stun Simmons. Grenia 134:24-135:9; Cataldo 302:16-306:7.

Admitted.

55.    Simmons was still on the floor, and the officers were able to front-handcuff him. Oliva 228:6-18; Grenia 140:11-141:2; Cataldo 250:4-251:6.

Admitted.

56.    After Simmons was front-cuffed, he managed to stand up, and he ran towards the front door of the house.. Oliva 229:59, 15-17; Grenia 144:2-145:8; Cataldo 253:16-254:4.

Admit only that after Simmons was front cuffed, he arched his back, threw all three officers off of him, stood up and ran toward the front door.  Oliva 229:59, 15-17; Grenia 144:2-145:8; Cataldo 253:16-254:4; otherwise denied.

57. As Simmons was running toward the front door of the house, Oliva tased Simmons in the back. Oliva 231:24-231:5, 233:5-13; Grenia 145:9-14; Cataldo 254:19-255:7.

Admitted.

58.     As a result of being tased, Simmons fell to his knees several feet before the door. Oliva 65:24-66:3, 233:20-22; Grenia 148:4-21; Cataldo 259:9-14.

        Admitted.

59.     All three officers rushed to Simmons. Grenia 148:22-149:8.

        Admitted.

60.     Cataldo maced Simmons in the face. Oliva 70:14-18, 71:19-72:5; Grenia 149:20-24; Cataldo 274:11-13, 278:18-22.

        Admit only that after giving Simmons a verbal warning that she would use her mace, Cataldo deployed it toward the lower part of his face. Cataldo 274:11-12, otherwise denied.

61.     The mace incapacitated Simmons, and the officers were able to move the handcuffs rom his front to his rear, such that he was rear-handcuffed. Oliva 65:2-8, 71:19-72:5, 240:25-241:12; Grenia 149:25-150:7; Cataldo 282:17-18, 283:6-16.

        Admit only that after the mace was deployed, the officers stretched Simmons' arms out in front of him in a "Superman position", removed his handcuffs and then re-handcuffed him in front using two sets of handcuffs connected for length. Oliva 65:2-8, 71:19-72:5, 240:25-241:12; Grenia 149:25-150:7; Cataldo 282:17-18, 283:6-16; otherwise denied.

62.     Simmons was lying down in a prone or partially position, rear-handcuffed. Oliva 72:24-73:2, 73:14-16.

        Denied.  After Simmons was re-handcuffed, he fell on his side.  He continued to fight the officers, by flailing, kicking and screaming.  He tried to throw the officers off in an attempt to get up.  He tried to bite Cataldo.  The officers continued to struggle with him. Grenia -151:23-152:15; Cataldo 285:13-288:10, 290:16-291:2.

63.     All three officers were on top of Simmons while he was in a prone position, rear-handcuffed. Oliva 74:14-18.

Denied. Simmons was not prone on the floor. He was on his side. Part of his chest and stomach never touched the ground. The officers were not all on top of his body. Oliva held one of his shoulders to the floor to keep his other shoulder elevated. Cataldo was by his lower back, putting her weight on his side and stomach. Oliva 74:19-75:24; Cataldo 287:22-288:6, 289:21-290:10, 290:16-291:2; Grenia 162:21-163: 12.

64.     Because Simmons was rear-cuffed, he no longer presented a significant threat. Oliva 85:8-14; Cataldo 288:25-289:4.

Denied. After Simmons was re-handcuffed, he continued to fight the officers by flailing, kicking, pinching, grabbing and screaming. He tried to throw the officers off in an attempt to get up. He tried to bite Cataldo. Grenia -151:23-152:15; Cataldo 285:13-287:15, 293:9-294:6.

65.     After the officers rear-cuffed Simmons, they placed him in a face-down position. Oliva 242:15-21.

Admit only that after Simmons was rear cuffed, he may have been face down prior to being on his side. Oliva 242:15-243:10; otherwise denied.

66.     Part of Simmons's chest was on the ground. Grenia 62:13-20.

Admit only that at times, part of Simmons chest was on the floor as he lay on his side. Part of his chest and stomach never touched the ground. Oliva 74:19-75:24; Cataldo 287:22-288:6, 289:21-290:10, 290:16-291:2; Grenia 162:21-163: 12.

67.     Part of Simmons's stomach was on the ground. Grenia 62:21-23.

Admit only that at times, part of Simmons stomach was on the floor as he lay on his side. Part of his chest and stomach never touched the ground. Oliva 74:19-75:24; Cataldo 287:22-288:6, 289:21-290:10, 290:16-291:2; Grenia 162:21-163: 12.

68.     Simmons was at least partially prone. Oliva 66:10-17, 116:7-18, 118:11-119:23, 120:3-10, 121:14-16, 160:7-161:12; Grenia 62:24-63:22, 160-161:3, 162:16-163:5, 169:11-22; Yovino 67:22-68:10, 87:24-88:4, 122:24-123:5; Poltorak 19:11-13, 22:10-25, 62:2-7, 62:1163:2, 88:3-22; Wustenhoff 61:7-23; Ciaccio 10:16-11:2, 40:10-13; Autopsy Report.

Admit only that part of Simmons' upper body was on the floor and part of Simmons' upper body was off the floor.  One of his shoulders was not touching the floor; 116:7-121:19, 160:7-161:12:  Grenia 62:24-63:22, 160-163:5: Yovino 67:22-68:10, 87:8-88:4, 122:24-123:5: Poltorak 18:18-19:8, 62:2-7, 62:11-63:2, 88:3-22; Wustenhoff 61:7-23; Ciaccio 10:16-11:2, 40:10-17; otherwise denied.

69.     Simmons was closer to prone than supine. Grenia 162:12-15; Autopsy Report.

Admit only that at points during the struggle and after he was handcuffed, Simmons was closer to prone than supine.  Thereafter, Simmons remained partially, if not fully, on his side until he stopped moving.  Cataldo 282:19-301:17; Grenia 166:4-23; Poltorak 73:4-75:19; Yovino 104:6-17; Leotta 67:6-69:16. 70:23-71-7; Pitkewicz 29:3-30:6, 42:7-17; Samartino 37:10-23, 40:20-25; Wuestenhoff 27:15-29:9, 61:7-23; O'Hara 18:22-20:3; Milau 19:13-20:12; otherwise denied.

70.     The fact that Simmons was partially prone created a risk of asphyxia. Oliva 123:10-24, 124:23-125:2; Grenia 64:5-9; Leotta 44:17-45:6.

Denied.  The cited testimony provides no evidence that being "partially prone" a creates a risk of asphyxia.

71.     Oliva was near Simmons' head, Grenia was near Simmons's feet, and Cataldo was in the middle near Simmons's torso. Grenia 163:18-164:4.

Admitted.

72.     Oliva was using force to hold Simmons' head and arm down on the ground. Oliva 75:25-76:8, 76:20-77:20, 106:4-12.

Admit only that Oliva was stabilizing Simmons' head by holding it toward the ground.  Oliva cannot say that Simmons' face was on the ground. Oliva 75:25-76:8, 76:20-77:20, 106:4-12; otherwise denied.

73.     Oliva used enough force holding Simmons' head and arm down on the ground that he became physically exhausted. Oliva 77:2-20, 77:25-78:17.

Admit only that Oliva became exhausted from his struggle with Simmons.  Oliva 77:2-20; otherwise denied.

74.     Grenia was using force trying to hold Simmons' legs together, including by using her body weight to put downward pressure on Simmons' legs. Grenia 164:5-11; Oliva 86:3-5.

Admit only that Grenia was using force to try to hold Simmons' legs together and was putting downward pressure on his legs to try to hold them on the floor.  However, she was unable to control Simmons' legs, and he continued to kick. Grenia 164:5-11; Oliva 86:3-13; otherwise denied.

75.     Cataldo was lying across the midsection of Simmons' body, using her body weight to hold his torso down. Oliva 74:19-75:6, 79:4-20, 84:17-85:3, 120:11-16, 121:10-13; Grenia 167:20-168:16; Cataldo 299:4-8.

Admit only that while Simmons had one side of his body on the floor, Cataldo was diagonally across Simmons, putting her stomach weight on his lower back. Her full body weight was not on him. She was not exerting any downward pressure on Simmons.  Oliva 74:19-75:20, 79:4-20, 84:17-85:3, 120:11-16, 121:10-122:7; Cataldo 296:3-8, 298:11; otherwise denied.

76.     Cataldo, Oliva, and Grenia continued to use their body weight to hold Simmons down even though he was rear-handcuffed. Grenia 188:13-25.

   Admit only that Cataldo, Oliva and Grenia put pressure on Simmons' body to hold him down. Grenia 188:13-25; otherwise denied.

   The cited testimony provides no evidence that Oliva's or Grenia's full body weight was ever on Simmons.

77.     The officers determined that they needed leg shackles to control Simmons' legs. Oliva 89:20-24.

   Admitted.

78.     At approximately 8:38 p.m., the dispatcher called a 10-1, meaning all available units should respond to the scene. Ciaccio 76:22-77:5; Ciaccio Ex. 2.

   Admitted.

79.     Samartino arrived at the scene at approximately 8:39 p.m. Leotta 127:7-13; Ciaccio 80:17-24; Ciaccio Ex. 2.

   Admit only that Samartino pulled his patrol car up to the house at approximately 8:39; otherwise denied.

80.     At approximately, 8:40 p.m., Oliva radioed dispatch requesting that someone bring leg shackles to the scene. Leotta 128:4-11; Ciaccio 82:24-83:11; Ciaccio Ex. 2.

   Admit only that at approximately 8:40 P.M. an officer, possibly Oliva, made a radio transmission requesting leg shackles; otherwise denied.

81.     The dispatcher responded to Oliva's request by acknowledging it and confirming that the situation was controlled. Ciaccio 83:12-84:3; Ciaccio Ex. 2.

Admitted.

82. Seconds later, Ciaccio radioed that he had plastic zip ties and was on his way. Ciaccio 84:4-14; Ciaccio Ex. 2.

Admitted.

83. Seconds later, dispatch radioed units responding to the scene to slow down because the situation was controlled. Ciaccio 85:16-86:6; Ciaccio Ex. 2.

Admitted.

84. Yovino arrived at the scene at approximately 8:41 p.m. Yovino 98:15-99:3; Ciaccio Ex. 2.

Admitted.

85. Cataldo, Oliva, and Grenia were still using their body weight to hold Simmons down when Yovino and Samartino arrived.

Admit only that Cataldo, Oliva and Grenia were still putting pressure on Simmons' body to hold him down. Grenia 179:23-17, 188:13-25; otherwise denied.

The cited testimony provides no evidence that Oliva's or Grenia's full body weight was ever on Simmons.

86. Leotta arrived at the scene at approximately 8:42 p.m. Leotta 49:10-19; Ciaccio Ex. 2.

Admitted.

87. Leotta, who held the supervisory rank of sergeant, was the senior officer in charge of the scene. Leotta 66:9-11, 81:6-19; Ciaccio 23:2-9; Pitkewicz 25:8-11.

Admit only that for a period of time, Sgt. Leotta may have been the senior officer inside the house.

The cited testimony provides no evidence that Sgt. Leotta was the senior officer in charge of the scene throughout the incident.

88.    Less than a minute after he arrived, Leotta radioed that the situation was "controlled" because Simmons was lying on the ground and rear-handcuffed. Leotta 53:2354:12, 86:21-25, 88:12-16, 128:12-129:5; Ciaccio 88:4-10.

Admitted.

89.    Dispatch responded by acknowledging that the situation was controlled. Ciaccio 88:11-19.

Admitted.

90.    Leotta decided that even though Simmons was not a criminal suspect, he should be taking into custody and transported to CPEP for mental observation. Leotta 54:13-55:7.

Admit only that prior to Leotta's arrival on the scene, the house manger had requested that the officers transport Simmons to CPEP. Fandrey Supplemental Report.

91.    Leotta decided that the safest way to do that would be to strap Simmons to an ambulance gurney. Leotta 56:16-20.

Admitted.

92.    Leotta decided that Simmons' legs should be tied together before he was strapped to a gurney for transport. Leotta 57:3-9, 58:5-9.

Admit only that Leotta determined that restraining Simmons' legs with zip-ties or shackles would be appropriate. Leotta 57:3-9, 58:5-9; otherwise denied.

93.     At approximately 8:43 p.m., Leotta radioed dispatch that and ambulance should be sent to the scene so that Simmons could be strapped to a gurney and transported to CPEP. Leotta 129:6-14; Ciaccio 88:20-89:90:7; Ciaccio Ex. 2.

        Admitted.

94.     The situation remained controlled. Leotta 130:2-5.

        Admitted.

95.     Wustenhoff arrived at the scene at approximately 8:45 p.m. Wustenhoff 18:2519:5; Ciaccio Ex. 2.

        Admitted.

96.     At approximately 8:45 p.m., Leotta radioed dispatch asking who was coming to the scene with leg shackles. Leotta 130:6-13; Ciaccio 90:15-91:2; Ciaccio Ex. 2.

        Admitted.

97.     Approximately three seconds later, the dispatcher responded that Ciaccio was bringing leg shackles to the scene. Leotta 132:7-15; Ciaccio 91:3-10; Ciaccio Ex. 2.

        Admitted.

98.     Poltorak arrived at the scene at approximately 8:45 p.m. Poltorak 55:17-25; Ciaccio Ex. 2.

        Admitted.

99.     Turner arrived at the scene at approximately 8:45 p.m. Turner 10:13-17.

        Admitted.

100.    Fierro arrived at the scene at approximately 8:46 p.m. Fierro 7:22-8:7; Ciaccio Ex. 2.

Admitted.

101.    Pitkewicz arrived at the scene at approximately 8:46 p.m. Pitkewicz 12:23-13:3; Ciaccio Ex. 2.

Admitted.

102.    Ciaccio arrived at the scene at approximately 8:47 p.m. Ciaccio 69:3-7, 70:13-15; Ciaccio Ex. 2.

Admitted.

103.    Pitkewicz and Ciaccio entered the home at approximately the same time. Pitkewicz 23:11-16.

Admitted.

104.    At approximately 8:49 p.m., Leotta radioed to dispatch that the situation remained controlled and that the officers just needed to get Simmons transported in an ambulance. Leotta 132:16-133:12; Ciaccio 93:8-17; Ciaccio Ex. 2.

Admit only that at approximately 8:49 p.m., Leotta radioed to dispatch that the situation remained controlled and that the officers just needed an ambulance or Emergency Services Unit to get Simmons transported to the hospital. Leotta 132:16-133:12; Ciaccio Ex. 2; otherwise denied.

105.    Cataldo continued to hold Simmons's midsection to the ground so that he could not get up. Turner 27:10-21, 41:24-42:2.

Denied. Cataldo was behind Simmons with her chest to his back with her arm over his left shoulder in an effort to hold him back from hurting himself or anyone else. She was not trying to hold him down or pressing him to the ground. Turner 27:10-30:14.

106. Leotta instructed the officers to make sure Simmons had a clear airway. Oliva 114:14-20; Grenia 166:17-21, 190:9-20, 193:3-17; Cataldo 309:10-25; Leotta 29:2-13; Yovino 181:3-8; Turner 67:5-8.

Admitted.

107. Leotta gave this instruction to the officers repeatedly. Oliva 114:18-20, 126:18127:6; Leotta 29:2-13; Yovino 121:16-122:9.

Admitted.

108. Leotta appeared to be concerned. Oliva 114:24-115:15.

Admitted.

109. Leotta never instructed the officers to stop putting weight on Simmons' back. Oliva 133:14-25; Leotta 82:13-83:2.

Admit only that Leotta did not tell the officers to stop using restraining force by or applying pressure to Simmons' back. Oliva 133:14-25; Leotta 82:13-83:2; otherwise denied.

110. As Cataldo, Oliva, and Grenia continued to struggle with Simmons, Yovino grabbed Simmons' wrists. Yovino 83:3-84:18.

Admitted.

111. Yovino continued to hold Simmons' hands for several minutes. Yovino 88:8-14.

Admitted.

112.    During that period, when Yovino was not holding Simmons' hands, he was holding his upper legs and buttocks area. Yovino 89:6-14.

Admit only that during the period when Yovino was not holding Simmons' hands, he may have held his upper legs or buttocks area. Yovino 89:6-14; otherwise denied.

113.    Poltorak, Wustenhoff, Pitkewicz, and Turner attempted to control Simmons' legs. Poltorak 27:10-20, 66:15-69:6, 66:22-67:5; Wustenhoff 33:10-34:3, 34:10-35:22, 36:13-19; Pitkewicz 24:12-21; Turner 42:18-23, 44:5-45:2.

Admitted.

114.    Poltorak, Wustenhoff, Pitkewicz, and Turner were able to control Simmons' legs and hold them until the zip ties arrived. Turner 45:3-46:8, 54:6-13.

Admitted.

115.    Poltorak, Pitkewicz, Turner, and Wuestenhoff applied the zip ties to Simmons' legs. Poltorak 69:7-15; 49:15-52:7; Samartino 25:2-5.

Admit only that Poltorak and Pitkewicz applied the zip-ties to Simmons' legs. Turner and Wuestenhoff may have also participated in applying the zip ties.  Poltorak 69:7-15; Samartino 25:2-5.

116.    Once Simmons was both rear-cuffed and leg-tied, he no longer presented any threat against any officer, and there no longer was a justification for using force on him. Turner 86:12-21.

Admit only that once Simmons was rear-cuffed and leg-tied, he was not a threat to an officer outside of striking distance.  He continued to thrash with significant force and roll from side to side. Turner 86:12-91:22; O'Hara 18:5-20:20; Milau 14:13-16:4; otherwise denied.

117.    O'Hara and Milau arrived at the scene at approximately 8:44. O'Hara 36:12-23.

Admitted.

118.    Oliva continued to use force to hold Simmons' head and arm down on the ground continuously until he stopped moving. Oliva 82:13-22, 89:16-19, 91:15-92:2; Yovino 89:18-3; O'Hara 12:17-22:9.

Admit only that Oliva remained in the same position with a hand pushing the right side of Simmons' head until Simmons stopped moving. Oliva 82:13-22; Yovino 89:18-3; otherwise denied.

119.    Cataldo continued to lie across the midsection of Simmons' body, using her body weight to hold his torso down, continuously until he stopped moving. Oliva 82:20-84:16, 9:1619, 92:3-5; Yovino 89:23-91:4.

Denied.  Cataldo was trying to keep Simmons' hands and hips still by remaining on her knees, on top of Simmons' hips,  with her stomach to Simmons' back.  Olivia 92:3-8; Yovino 89:23-90:16; Cataldo 289:21-291:7; otherwise denied.

120.    Simmons continued to be at least partially in a prone position continuously until he stopped moving. Oliva 82:19-23; O'Hara 18:22-20:3; Milau 20:8-12.

Denied.  Simmons remained partially, if not fully, on his side until he stopped moving.  Cataldo 282:19-301:17; Grenia 166:4-23; Poltorak 73:4-75:19; Yovino 104:6-17; Leotta 67:6-69:16. 70:23-71-7; Pitkewicz 29:3-30:6, 42:7-17; Samartino 37:10-23, 40:20-25; Wuestenhoff 27:15-29:9, 61:7-23; O'Hara 18:22-20:3; Milau 19:13-20:12.

121.    Cataldo and Oliva continued to put their weight on Simmons and to hold him down even after Simmons' legs were tied together with zip ties. Oliva 101:2-6, 101:25-102:24; Poltorak 72:22-24; O'Hara 20:21-16, 21:17-22:2.

Admit only that after the zip ties were applied, Oliva continued using one hand to try to push Simmons' head down while keeping a knee or leg on Simmons' arm, and Cataldo was partially against Simmons' back while Simmons' side remained off the ground. Oliva 101:2-6, 101:25-102:24; Poltorak 72:22-24; 73:4-74:19; Cataldo 289:21-291:7; otherwise denied.

122. Simmons was not able to move his legs at all because they were tied and one or more officers were holding them down. Milau 20:16-21:17.

Admit only that Simmons was unable to move his legs individually; otherwise denied.

123. Simmons was thrashing his torso around as the officers continued to put weight on him, but he did not appear to be trying to get up. O'Hara 20:14-20.

Admit only that Simmons was thrashing his torso around with significant force and rolling from side to side as the officers continued to put weight on him, but it did not appear that he was going to get up. O'Hara 18:5-20:20; Milau 14:13-16:4; otherwise denied.

124. Even after Simmons was rear-cuffed and leg-tied, the officers continued to use a significant amount of force to hold him down. Milau 12:2-16:4.

Admit only that Simmons was using a significant amount of force against the officers and they used the least amount of force necessary to restrain him, and did not use unreasonable force. Milau 12:2-16:4; otherwise denied.

125. The officer closest to Simmons's head was pushing him down. Milau 21:1822:13.

Admit only that an officer near Simmons' upper body was putting downward pressure on Simmons. Milau 21:18-22:13; otherwise denied.

126. Cataldo was pushing Simmons's torso down. Milau 22:14-23:2.

Admit only that while Simmons was on his side, Cataldo was to Simmons' back, in a kneeling position using her upper torso and arms to try to control his lower torso. Cataldo 289:21-291:7, 321:6-325:23; Milau 12:2-23:2; otherwise denied.

127.    The officers continued to hold Simmons down, while he was rear-cuffed and leg-shackled, in at least a partially prone position until he stopped moving. Oliva 102:15-24; Cataldo 321:6-10, 385:25-386:5.

Admit only that after the zip ties were applied, Oliva continued using one hand to try to push Simmons' head down while keeping a knee or leg on Simmons' arm; Cataldo was partially against Simmons' back while Simmons' side remained off the ground. Simmons was still on his side when he stopped moving. Oliva 101:2-6, 101:25-102:24; Cataldo 321:6-10, 323:3- 324:10, 385:25-386:5; Poltorak 72:22-24; 73:4-74:19; Milau 12:2-4, 19:4-20:12; Yovino 104:10-17; otherwise denied.

128.    As the officers were trying to apply the leg restraints to Simmons, Wustenhoff pulled Simmons's left foot 12 inches up in the air, backwards, as Simmons lay on his front. Wustenhoff 45:12-46:20.

Admit only that in attempting to apply leg restraints, Wuestenhoff lifted Simmons' foot 12 inches off the ground in a canted manner. Wuestenhoff 45:12-46:20; 50:9-14; otherwise denied.
The cited testimony provides no evidence that Simmons's was laying on his front at the time.

129.    Wustenhoff believed it was necessary to lift Simmons' foot in the air, backwards, in order to apply the leg restraints. Wustenhoff 63:13-19.

Admit only that in attempting to apply leg restraints, Wuestenhoff lifted Simmons' foot 12 inches off the ground in a canted manner. Wuestenhoff 45:12-46:20; 50:9-14; otherwise denied.

The cited testimony provides no evidence that Wustenhoff believed it was necessary to lift Simmons' foot in the air, backwards, in order to apply the leg restraints.

130.    Wustenhoff raised Simmon's left foot in the air for approximately 30 seconds to a minute before the leg restraints were applied to both legs. Wustenhoff 50:9-22.

Denied.  The cited testimony reflects that Wuestenhoff applied a zip tie to Simmons' left leg while the leg was lifted.

131.    Due to Simmons' autism, he spoke very little, and was unable to communicate verbally that he could not breathe. Fandrey I 190:8-11; Fandrey Ex. 2.

Denied.  The cited testimony provides no evidence that Simmons' autism rendered him unable to verbally communicate that he could not breathe.  Simmons could speak in phrases since he was age 6 or 7.  He could also speak in sentences, with prompting. Simmons 37:14- 20.

132.    Very shortly after the zip ties were applied to Simmons's legs, he suddenly went limp and stopped breathing.  Yovino 104:6-13, 108:16-22; Poltorak 71:6-25; Wustenhoff 52:1653: 5, 61:24-22., 63:25-64:4, 64:8-12; Turner 56:20-57:11.

Admit only that the struggle continued for approximately 30 seconds to a couple of minutes after the zip ties were applied.  Wuestenhoff 52:16-20; Turner 56:20-57:20; otherwise denied.

133.    The EMTs had not yet arrived when Simmons went into cardiac arrest. Ciaccio 32:6-10.

Admitted.

134.    The officers uncuffed Simmons, rolled him onto his back, and Yovino began CPR. Yovino 113:20-114:6; Wustenhoff 55:2-12.

Admitted.

135.    The officers also tried to revive Simmons by using an automated defibrillator. Yovino 115:13-116:19; Poltorak 78:14-25; Wustenhoff 55:2-12.

    Admitted.

136.    EMS arrived at the scene at 8:51 p.m. Oliva Ex. 1.
    Admitted.

137.    EMS arrived at the scene approximately one minute after Simmons went into cardiac arrest. Leotta 94:7-12; Poltorak 87:11-88:2; Wustenhoff 19:10-21; Oliva Ex. 1. 138.

    Admit only that EMS arrived at the scene approximately one minute after Simmons went into cardiac arrest, and that EMS had been requested prior to Simmons going into cardiac arrest. Leotta 94:7-12; Poltorak 87:11-88:2; Wustenhoff 19:10-21; Oliva Ex. 1. 138; Prehospital Care Report; CAD printout, Suffolk County Police Department Communications Bureau tape of radio transmissions related to incident; otherwise denied.

138.    No officer radioed dispatch to inform dispatch that Simmons had gone into cardiac arrest. Leotta 89:3-6; Fierro 21:23-22:7; Ciaccio 98:15-100:10, 100:23-101:7.

    Admitted.

139.    Normally, when a subject goes into cardiac arrest, an officer radios that fact to dispatch. Ciaccio 28:2-29:16.

    Admit only that when a subject goes into cardiac arrest, an officer usually radios that fact to dispatch.  However, here there was no need to contact dispatch to request EMS assistance after Simmons went into cardiac arrest because EMS had already been requested.  Ciaccio 28:2-29:16;  Prehospital Care Report; CAD printout, Suffolk County

Police Department Communications Bureau tape of radio transmissions related to incident; otherwise denied.

140.    All of the officers who were involved in the incident were placed in the same room together at the 7th precinct – the crime control room – where they discussed the incident with one another. Cataldo 39:12-40:10, 357:24-358:4, 359:3-8; Oliva 150:9-151:15, 151:23152:4, 152:17-22; Grenia 210:24-212:8; Yovino 8:23-9:5, 20:4-20; Poltorak 30:24-31:11; Ciaccio 48:2-15; Turner 77:9-79:12.

Admit only that in the hours following Simmons' death, the officers who were involved in the incident were present, at varying times, in the 7th precinct – the crime control room – where they discussed the incident with one another. Cataldo 39:12-40:10, 357:24-358:4, 359:3-8; Oliva 150:9-151:15, 151:23152:4, 152:17-22; Grenia 210:24-212:8; Yovino 8:23-9:5, 20:4-20; Poltorak 30:24-31:11; Ciaccio 48:2-15; Turner 77:9-79:12; otherwise denied.

141. One of the things the officers discussed was whether Simmons might have asphyxiated. Ciaccio 48:11-23, 49:10-12, 51:10-17.

Admit only that some of the officers discussed whether Simmons might have asphyxiated. Ciaccio 48:11-23, 49:10-12, 51:10-17; otherwise denied.

142.    It was improper for the officers to discuss the incident before they completed their written reports about the incident. Leotta 114:6-115:12.

Admit only that Sgt. Fandrey, who was in charge of the investigation of Simmons' death for the Homicide Squad, is of the opinion that it is the best practice to interview officers involved in a death before they have discussed the incident with other officers; but he would not be concerned if he learned that such discussion occurred prior to his interviews.  Fandrey 67:23-71:8; otherwise denied.

143.    Simmons's death was a homicide. Autopsy Report; Baden Decl.; Fandrey I 7:1318.

Admit only that the Suffolk Medical Examiner's Office classified Simmons' death as a homicide for civil law, autopsy purposes; otherwise denied.

144.    The cause of Simmons' death was a violent struggle that included prone positioning and chest compression. Autopsy Report.

Denied.  The Suffolk County Medical Examiner's Office Report of Autopsy states that the cause of death was "sudden death during violent struggle including prone positioning and chest compression in a person with obesity with hypertensive cardiovascular disease"; Suffolk County Deputy Medical Examiner Maura DeJoseph ("Dr. DeJoseph"), the pathologist who performed the autopsy for the Suffolk County Medical Examiner's Office, is of the opinion that the struggle with police alone could have killed Simmons.  Dr.  Wetli is of the opinion that the cause of Simmons' death was intense exertion, with lactic acidosis and surge of nor-epinephrine due to his resistance to the officers; and that there is no evidence that the death was due to positional asphyxia, the application of tasers, or pepper spray.  Dr Wetli ruled out asphyxia as the cause of Simmons death. Autopsy report; DeJoseph 98:2-22; Wetli report; Wetli 32:17-22, 33:22-34:15, 41:12-44:24, 58:19-24, 124:13-126:24, 127:17-128:9, 132:14-17, 164:3-19.

145.    The compression of Simmons chest caused him to be deprived of oxygen and to asphyxiate. DeJoseph 7:1-4, 83:2-7, 103:7-17; Baden Decl.

Denied.  The cited testimony of Dr. DeJoseph provides no evidence that the cause of Simmons' death was chest compression which caused him to be deprived of oxygen and asphyxiate, but rather that Dr. DeJoseph is of the opinion that chest compression was a component of the death; that asphyxiation occurs in all deaths; and that she cannot say when during the course of the struggle weight was placed on Simmons.  Dr. Wetli is of the opinion that the cause of Simmons' death was not chest compression, but intense exertion, with lactic acidosis and surge of nor-epinephrine due to his resistance to the officers, and that there is no evidence that the death was due to positional asphyxia, the application of

32

tasers, or pepper spray. Dr Wetli ruled out asphyxia as the cause of Simmons death. Autopsy report.; DeJoseph 7:1-8:8, 103:7-22, 110:1-11, 109:4-25; Wetli report; Wetli 32:17-22, 33:22-34:15, 41:12-44:24, 58:19-24, 124:13-126:24, 127:17-128:9, 132:14-17, 164:3-19.

146.    The fatal chest compression occurred toward the end of the timeline, shortly before Simmons went limp. DeJoseph 109:20-25; Baden Decl.

Denied.  The cited testimony provides no evidence that Dr. DeJoseph concluded that fatal chest compression occurred shortly before Simmons went limp. Dr. DeJoseph could not say when during the course of the struggle weight was placed on Simmons. Dr. Wetli is of the opinion that the cause of Simmons' death was not chest compression, but intense exertion, with lactic acidosis and surge of nor-epinephrine due to his resistance to the officers, and that there is no evidence that the death was due to positional asphyxia. Dr Wetli ruled out asphyxia as the cause of Simmons death. DeJoseph 7:1-8:8, 103:7-22, 109:4-25; Wetli report, Wetli 32:17-22, 33:22-34:15, 41:12-44:24, 58:19-24, 124:13-126:24, 127:17-128:9, 132:14-17, 164:3-19.

147.    The compression of Simmons chest and resulting oxygen deprivation was a substantial factor in causing his death. DeJoseph 7:12-8:17, 12:7-9; Baden Decl.; Fandrey I 195:9-21.

Admit only that Dr. DeJoseph is of the opinion that the compression of Simmons' chest and resulting oxygen deprivation was among multiple substantial factors in causing his death; but that she cannot ascribe percentages of significance to the various substantial factors; DeJoseph 7:1-8:8, 103:7-22; otherwise denied.

Dr. Wetli is of the opinion that the cause of Simmons' death was not chest compression, but intense exertion, with lactic acidosis and surge of nor-epinephrine due to his resistance to the officers, and that there is no evidence that the death was due to positional asphyxia, the application of tasers, or pepper spray; autopsy report; Dr Wetli

ruled out asphyxia as the cause of Simmons death. Wetli report, Wetli 32:17-22, 33:22-34:15, 41:12-44:24, 58:19-24, 124:13-126:24, 127:17-128:9, 132:14-17, 164:3-19.

148.    Mr. Simmons's body had contusions that were consistent with chest compression. Autopsy Report at 2; DeJoseph 13:12-21.

Denied.  Dr. Wetli is of the opinion that Simmons' body did not have the sort of bruises and contusions associated with chest compression asphyxia, nor did it have rib fractures or other injuries to the torso that would be indicative of chest compression asphyxia. Wetli 103:12-105:23, 117:7-9, 124:13-126:24, 127:17-128:9, 132:14-17. 163:3-165:7; Wetli report.

149.    Simmons's body had petechial hemorrhages. O'Hara 48:19-22; Fandrey II 15:1810.

Admit only that Dr. Wetli is of the opinion that Simmons body had a paucity of conjunctival petechiae; that there were no petechiae of the skin of the upper eyelids, bitemporal face or oral mucosa; that conjuctival petechiae merely indicate increased venous pressure of the facial area, and their most common cause is sudden cardiac death, not asphyxia.  Wetli report; Wetli 102:9- 106:10, 161:17-162:14; otherwise denied.

150. The petechiae on Simmons's shoulder and eyelids were indicative of chest compression. DeJoseph 13:22-25; Fandrey II 16:2-10.

Admit only that Dr. DeJoseph was of the opinion that the petechiae on Simmons' shoulder and eyelids supported her conclusion that his chest was compressed. Dr. Wetli is of the opinion that there was no evidence of chest compression on Simmons' body, for among other circumstances, there was a paucity of eyelid petechiae and an absence of deep bruises to the torso.  DeJoseph 13:22-25; Fandrey II 16:2-10; Wetli 132:6-9, 163:14- 165:7; otherwise denied.

151.    The medical examiner found abundant evidence that Simmons' chest was compressed. DeJoseph 69:10-13.

34

Admit only that Dr. DeJoseph was of the opinion that Simmons' body had abundant evidence of chest compression, but not asphyxia. DeJoseph 69:10-13; otherwise denied.

152.    The medical examiner informed Fandrey that she had found abundant evidence of compression asphyxia. Fandrey I 99:11-100:2, 116:3-9.

Admit only that Fandrey believes it is likely that that the Medical Examiner's office told him that there was abundant evidence of compression asphyxia. Dr. DeJoseph does not recall what she told Fandrey.  Fandrey I 99:11-100:2, 116:3-9; DeJoseph 68:19- 70-4; otherwise denied.

153.    The Office of the Suffolk County Attorney represents Dr. DeJoseph in this case.

Admit only that the Suffolk County Attorney's Office represented Dr. DeJoseph as a witness in this case, at her request, pursuant to the Suffolk County Code; otherwise denied.

154. The fact that Simmons was obese and in a partially prone position also was a substantial factor in causing his death because prone positioning combined with obesity makes it more difficult for the subject's chest to expand during respiration. DeJoseph 8:24-10:3, 14:7-14, 15:7-8, 58-60:11, 98:23-99:1; Baden Decl.

Denied. The cited material provides no evidence that being in a *partially* prone, as opposed to a *fully* prone, position, makes it more difficult for an obese subject's chest to expand during respiration.

Dr. Baden, plaintiff's expert, is of the opinion that there is less of a compressive effect where the person is not fully prone.  Baden 88:24-92-21. Dr. Wetli is of the opinion that even prone positioning of an obese person does not interfere with respiration.  Wetli report.

155.    The fact that Simmons was rear-cuffed while he was in a partially prone position exacerbated the risk that he would asphyxiate. DeJoseph 61:12-23.

Denied.  Simmons' did not stop breathing for more than five minutes after he was rear handcuffed, during which time he was continually lying on his side and continually moving.  Even if Simmons' had been intermittently prone during that period of time, during the periods when he was not prone and the alleged compression on his front chest thereby released, according to Dr. Baden, he would breathes normally again: the subsequent resumption of pressure would not have a cumulative effect that could cause asphyxiation; and there is no connection between handcuffing and asphyxia. Baden 157:22- 158:18.

156.	The fact that Simmons was engaged in violent struggle prior to being placed in prone position exacerbated the risk that he would asphyxiate. DeJoseph 42:23-43:8.

Denied. The cited testimony provides no evidence that being involved in a struggle exacerbates the risk of asphyxia. DeJoseph 42:23-43:8.

157.	The fact that Simmons was obese exacerbated the risk that he would asphyxiate. Wetli Dep; Baden Aff.

Admit only that obese persons can be more at risk for asphyxia if weight is put on them. Wetli 220:5-221:22; otherwise denied.

158.	None of the officers was justified in using deadly force. Leotta 52:25-53:9, 64:25-65:9.

Denied. The officers did not use deadly force.

159.	Suffolk County, through its medical examiner, determined that Simmons's death was a homicide caused in substantial part by chest compression during prone positioning. Autopsy Report; DeJoseph Dep.

Admit only that the Suffolk County Medical Examiner's Office Report of Autopsy states that the cause of death was "sudden death during violent struggle including prone positioning and chest compression in a person with obesity with hypertensive

cardiovascular disease"; Dr. DeJoseph is of the opinion that the compression of Simmons' chest and resulting oxygen deprivation was among multiple substantial factors in causing his death; but that she cannot ascribe percentages of significance to the various substantial factors; DeJoseph 7:1-8:8, 103:7-22; otherwise denied.

160.    Suffolk County presented the facts and circumstances of Simmons's death to a Suffolk County grand jury as a homicide.

        Denied.  The matter was presented to a grand jury because all in-custody deaths in Suffolk County are presented to a grand jury.  Fandrey. 84:13-16.

DATED:  Hauppauge, New York
        July 20, 2017

                                Dennis M. Brown
                                Suffolk County Attorney
                                Attorney for Defendants
                                H. Lee Dennison Building
                                100 Veterans Memorial Highway
                                Hauppauge, New York 11788


                        By:     Arlene S. Zwilling
                                Assistant County Attorney